UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHONTEL M. MILLER, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:11-cv-01004-TWP-DML |
| POLARIS LABORATORIES, LLC, | ) |
| Defendant. | ) |

**ENTRY ON SUMMARY JUDGMENT**

This matter is before the Court on Defendant POLARIS Laboratories, LLC's ("POLARIS") Motion for Summary Judgment (Dkt. 94). Plaintiff Chontel M. Miller ("Ms. Miller") was an employee of POLARIS and alleges it terminated her because of her race in violation of the Civil Rights Act of 1964 as amended ("Title VII") and 42 U.S.C. § 1981 ("§ 1981"). She further alleges POLARIS retaliated against her for complaining about racial discrimination. For the reasons set forth below, POLARIS' Motion for Summary Judgment (Dkt. 94) is **GRANTED in part** and **DENIED in part**.

**I. BACKGROUND**

The Court deems the following facts undisputed, and considers these facts in the light most favorable to Ms. Miller, the non-moving party. POLARIS is a company which processes and analyzes lubricants, oils, coolants, and other fluids. It is headquartered in Indianapolis, Indiana, and has several other locations throughout the United States, Canada and Guatemala. Ms. Miller, an African-American, was hired by POLARIS on August 17, 2009, into a data-entry position as a Sample Processing Technician ("Sample Processor"). A Sample Processor was required to quickly and accurately log information from samples received by customers into a

computer database.  At the time of her hire, Ms. Miller was the only African-American in her department.  Her direct supervisor was Rhonda Ballard ("Ms. Ballard"), who was also a Sample Processor.  Debbie New ("Ms. New") was Ms. Ballard's direct supervisor and the Manager of the Sample Processing Department.  Other sample processors during Ms. Miller's employment included Amanda Saperstein ("Ms. Saperstein"), Bobbie Jo Young ("Ms. Young"), Adam Zimmerman, Gina Kemp ("Ms. Kemp"), and Kristi Reed.  Sharon Holmes ("Ms. Holmes") and Terry Shotts were also employed in the Sample Processing Department.  Ms. Saperstein was hired on August 24, 2009—around the same time as Ms. Miller—and Ms. Young was also new to the position, having been hired on June 22, 2009.

A few weeks into Ms. Miller's employment, she complained to Ms. New that Ms. Ballard was not properly training her.  Then, Ms. New began training Ms. Miller and Ms. Saperstein in a separate training room, away from the main department work area. Shortly thereafter, on September 18, 2009, a verbal altercation took place between Ms. Miller, Ms. Ballard, Ms. Kemp, and Ms. Holmes.  The Court is unable to discern an exact version of events, but an exact version is not material to Ms. Miller's claims.  In essence, the following took place:  Ms. Saperstein told Ms. Miller that she overhead either Ms. Kemp or Ms. Ballard call Ms. Miller "the colored girl." Late in the day on September 18, 2009, the Sample Processors were waiting for Ms. Miller to finish her work so they could all go home. Ms. Miller was in the training room with Ms. Saperstein.  Ms. Holmes checked in on Ms. Miller multiple times, but no one offered to help Ms. Miller.  Ms. Miller became frustrated and shouted at Ms. Holmes, which drew Ms. Kemp and Ms. Ballard into the room.  Ms. Miller accused Ms. Kemp and Ms. Ballard of calling her "the colored girl," of being racist, prejudiced, and treating her differently.  Ms. Kemp and Ms. Ballard denied the accusations, and Ms. Miller demanded to see a manager.  Director of Laboratory

Operations Joseph Culp ("Mr. Culp") was in his office, and Ms. Miller and Ms. Ballard went to see him. Ms. Miller told him that one of the Sample Processors' had referred to her as "the colored girl," which Ms. Ballard denied. Mr. Culp referred the situation to Human Resources Manager Chad Ziegler ("Mr. Ziegler").

The following Monday, September 21, 2009, Mr. Ziegler began investigating the September 18, 2009 incident, which included Ms. Miller's complaint of being called "the colored girl" and the alleged racism of several Sample Processors. He met with and interviewed Ms. Miller. She told him she believed Ms. Ballard, Ms. Holmes, and Ms. Kemp were racist, and that Ms. Ballard or someone else called her "the colored girl." Mr. Ziegler interviewed each Sample Processor about the incident. Ms. Ballard and Ms. Kemp denied calling Ms. Miller "the colored girl" and denied treating Ms. Miller differently because of her race. None of the Sample Processors could recall who made the comment, though Ms. Saperstein confirmed the comment was made, that she heard it and told Ms. Miller. Mr. Ziegler and Ms. New met with Ms. Miller again on September 22, 2009. They advised her that the investigation could not confirm that the statement had been made and asked Ms. Miller what her preferred outcome was. Ms. Miller expressed her desire to be treated as one of the team. Mr. Ziegler also met with Ms. Ballard, Ms. Kemp, and Ms. Holmes. He informed them that discriminatory or negative treatment of another employee would not be tolerated. Mr. Ziegler considered the investigation closed. Ms. Miller testified that she was humiliated and felt "destroyed" by "the colored girl" reference. Dkt. 96-1 at 7.

Throughout the remainder of her employment, Ms. Miller often complained to Ms. New because she was treated as an outcast, given more difficult work, and her work was tampered with. On several occasions Ms. Miller caught Ms. Ballard altering her trays. For example, on

one occasion Ms. Miller returned early from lunch and observed Ms. Ballard adding additional samples to Ms. Miller's trays. Ms. Miller told Ms. New she thought she was treated differently because she was "the colored girl." Ms. New did not follow up on Ms. Miller's complaints. Ms. Young also reported to Ms. New that she had witnessed Ms. Ballard and Ms. Kemp mixing up Ms. Miller's trays and giving Ms. Miller harder trays to learn on.

In the first four months on the job, Ms. Miller averaged 123 samples logged per day. She was given a quota of an average of 260 samples per day. Ms. New had discussions with Ms. Miller about her lack of speed, not hitting quota, and the need to get her production up to department expectation. In February 2010, Ms. Miller received her first performance evaluation. The official review stated that Ms. Miller "needs to average 260 samples per day for 2010. She will need to be averaging this goal by the end of March." Dkt. 96-2 at 18. By the end of March, Ms. Miller was logging an average of 189 samples per day, which was below the expectation. During the first week of April she logged 128, 160, 168, and 172 samples, also below the expectation. Dkt. 96-2 at 20. POLARIS then placed Ms. Miller on probation on April 7, 2010, stating that Ms. Miller "must speed up her logging and be at 260 samples per day average for the month of April." Dkt. 96-2 at 20. By April 29, 2010, Ms. Miller was averaging 184 samples per day, though on April 28, 2010 she logged 288 samples. As a result of Ms. Miller's failure to meet the 260 average daily quota, Ms. New recommended that Ms. Miller be terminated. Ms. New's recommendation was confirmed by Chief Operating Officer Mark Minges ("Mr. Minges") and Mr. Culp. Mr. Minges reviewed the production data and Ms. Miller's numbers before reaching the conclusion that termination was warranted for low productivity. On April 29, 2010, Ms. New and Mr. Ziegler met with Ms. Miller and told her she was terminated for failing to meet the 260 average daily quota.

Ms. Ballard worked at POLARIS for many years and employees frequently complained of poor treatment by Ms. Ballard, including that she was generally rude, belittling, and had poor interpersonal skills. She was counseled about the need for tact, being conscious of her tone, communications with employees, and conflict with another employee (not Ms. Miller). A common complaint was that Ms. Ballard played favorites. Additional facts will be discussed below, as necessary.

## II. **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the

material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

### III. DISCUSSION

Ms. Miller's allegations relate to race discrimination and retaliation. As an initial matter, it is worth noting that Ms. Miller's discrimination and retaliation claims are brought under both Title VII and § 1981. From a practical standpoint, this is a distinction without a difference. These claims, although brought under different statutes, are functionally identical; therefore, the same analysis will apply. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) (utilizing same analysis for § 1981 and Title VII); *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) (same). Ms. Miller's race discrimination and retaliation claims will be addressed in turn below.

**A. Race Discrimination**

**1. Legal Principles**

In the Seventh Circuit, it has been well-established that a plaintiff may prove discrimination under Title VII or § 1981 in one of two ways: either through direct evidence, or indirectly through the burden-shifting mechanism of *McDonnell Douglas*. *See Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000). Under the direct method, a plaintiff may proffer direct or circumstantial evidence to prove discrimination. Direct evidence establishes "the fact in question without reliance on inference or presumption." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (citation omitted). A plaintiff may also prevail under the direct method by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decision maker." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citation and internal quotations omitted). "That circumstantial evidence,

however, must point directly to a discriminatory reason for the employer's action." *Id*. (citation and internal quotations omitted).

Alternatively, a plaintiff can use the indirect method of proof, which consists of three basic steps: (1) a plaintiff must establish a *prima facie* case of discrimination based on race; (2) if she does so, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse action; and (3) the plaintiff must then come forward and show the stated reason is pretextual. *See Henderson*, 207 F.3d at 376. A plaintiff establishes a *prima facie* case by establishing evidence that would allow a reasonable jury to find on each claim that: (1) she is a member of a protected class; (2) she was meeting the employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated non-protected class member. *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005).

However, in *Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012), Judge Wood's concurrence called for collapsing the direct and indirect methods of proof into a single test. *Id.* at 863 (Wood, J. concurring). In subsequent cases, majority opinions of the Seventh Circuit have agreed with Judge Wood. *See Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737 (7th Cir. 2013) ("[W]e hasten to join in the growing chorus of opinions in this circuit, signed onto by a majority of active judges, that have expressed frustration with the confusing 'snarls and knots' of this ossified direct/indirect paradigm, and that have suggested a more straight-forward analysis of whether a reasonable jury could infer prohibited discrimination."); *Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 514 (7th Cir. 2012); *Good v. Univ. of Chi. Med. Ctr.*, 673 670, 680 (7th Cir. 2012); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 314–14 (7th Cir. 2012). However each of the cases cited immediately above still applied the direct/indirect methods as set out by the

United States Supreme Court, and only note that under Judge Wood's approach in *Coleman*, the same result would be obtained.

The Court agrees with its colleague in *Roe v. Target Corp.*, No. 1:11-cv-0555-JMS-TAB 2012 WL 3257891, at *13 (S.D. Ind. Aug. 8, 2012), that, "until the muddy water of evidentiary proof in discrimination cases is cleared by a complete abandonment of two separate 'proof' methodologies, such as proposed by Judge Wood in her concurrence in *Coleman,* the trial courts must soldier on, wading through the swampy areas of overlap in both evidence and legal theory." (citation omitted). This approach is adhered to by the Seventh Circuit, and the Court will not depart from it absent direct instruction otherwise. *See, e.g.*, *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014) (citing direct and indirect methods and applying the indirect method; no discussion of *Coleman* or departure from direct and indirect approaches).

### 2. Ms. Miller's Claim

POLARIS uses the indirect method to analyze Ms. Miller's claim, while Ms. Miller asserts she can prove her claim through the totality of the circumstances and circumstantial evidence. As noted above, circumstantial evidence that "allows a jury to infer intentional discrimination by the decision maker" can support a claim for racial discrimination. *Rhodes*, 359 F.3d at 504. Circumstantial evidence can be (1) suspicious timing, ambiguous statements, etc., (2) evidence that similarly situated employees were treated differently, or (3) evidence that the employee was qualified and passed over for the job and the employer's reason for the difference in treatment is a pretext for discrimination. *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). However, a derogatory statement alone "fails to show discrimination unless it is related to the employment decision." *Id.* "[T]here must be a real link between the bigotry and an adverse employment action." *Id. See Zayas v. Rockford Mem'l Hosp.*, __ F.3d __, 2014

WL 325260, at *2 (7th Cir. Jan. 30, 2014) (finding insufficient circumstantial evidence when plaintiff relied "on a single derogatory comment about Spanish speakers made by [her] *co-worker* (rather than a supervisor) and on the fact that her replacement is white" (emphasis in original)).

To maintain a claim for racial discrimination, there must be evidence that an employer's actions were taken with racial animus. *Collins v. Am. Red Cross*, 715 F.3d 994, 1001 (7th Cir. 2013). For example, in *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012), the African-American plaintiffs made "numerous complaints to management, some involving racial issues and others involving general workplace disputes" over the course of several years of employment. The employer took action on some of the complaints, but not all. The plaintiffs also received negative criticism from supervisors, which they interpreted as racial harassment. *Id.* The Seventh Circuit found that this evidence did not support a claim for racial discrimination: "All of the criticisms used non-racial language and nothing else about their context suggests they were racially motivated. Perhaps their supervisors' criticisms were unfair—clearly the plaintiffs feel that they were—but there is no evidence that they were unfair *because they were motivated by race*, as Title VII forbids." *Id.* at 1006 (internal citation omitted) (emphasis in original).

In *Harris v. Warrick Cnty. Sheriff's Dep't*, 666 F.3d 444 (7th Cir. 2012), the African-American plaintiff alleged he was called racist nicknames and was treated differently than similarly situated white co-workers. The Seventh Circuit found there was evidence of workplace racial bias, but that no one in the decision-making chain used the racial nicknames. *Id.* at 448. The court stated that "[t]o prove employment discrimination, a plaintiff needs direct or circumstantial evidence that the *decisionmaker* has acted for a prohibited reason." *Id.* (internal

citation omitted). However, the court noted the "cat's paw" theory of liability, which is the existence of a link "between an employment decision made by an unbiased individual and the impermissible bias of a non-decisionmaking co-worker." *Schandelmeier-Bartels v. Chi. Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011). As explained in *Schandelmeier-Bartels*:

> The name is based on an old fable in which a scheming monkey convinces an unwitting cat to fetch roasting chestnuts from a fire. The cat burns its paw and the monkey gets the chestnuts. In employment discrimination cases, the "cat's paw" is the unwitting manager or supervisor who is persuaded to act based on another's illegal bias. With sufficient evidence, we permit juries to draw an inference that another employee's impermissible bias infected a decision when a plaintiff is able to show that the biased employee had some degree of influence over the ultimate decision. Deciding the degree of influence required to permit that inference, however, is not so simple.

*Id.* The Supreme Court addressed the theory in *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011), holding that an employer may be liable for employment discrimination if a non-decision maker "performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action." (emphasis in original).

Ms. Miller relies not only on the derogatory racial comment allegedly made by her supervisor, but also evidence that her supervisor purposefully sabotaged her productivity by giving her harder work than her co-workers. This allegation is supported by co-worker Ms. Young, who testified that:

> One day, in a stressful day, we had a lot of trays. [Ms. Miller] was a little newer than the rest of us, and I went to grab a tray from [Ms. Ballard]. And she held the tray up, and it had a lot of Xs on it, and I went to grab it. And she said, No, this is for [Ms. Miller]. Do you see what I'm trying to do here? And I basically told [Ms. New], and [Ms. New] said, I'm aware.

Dkt. 96-12 at 12, 46:18–25. This occurred after the September 18, 2009, incident. Ms. Young and Ms. Miller both testified that a tray with "Xs" is more difficult than a tray without Xs. Ms.

Young interpreted Ms. Ballard's comment to mean that Ms. Ballard was purposefully giving Ms. Miller harder work. On a separate occasion, Ms. Young witnessed co-worker Ms. Kemp shuffling Ms. Miller's samples out of order, which would make the tray more difficult. Ms. Kemp said to Ms. Young, "I better go fix it because that bitch is going to go complain." Dkt. 96-12 at 13, 50:2–4. Ms. Young did not tell Ms. New about this incident. However, Ms. Young also testified that she overheard Ms. Kemp say she would not help Ms. Miller and call Ms. Miller "a stupid nigger bitch," to which Ms. Ballard laughed and agreed. Dkt. 96-12 at 11, 41:14, 42:24–25. Ms. Young told Ms. New shortly after overhearing the statement so that Ms. New could deal with the issue. When Ms. Young reported the statement, Ms. New merely responded "ahah."

Further, Ms. Miller testified that she complained specifically about unfair and poor treatment to her manager, Ms. New, and that the derogatory treatment was based on her being "the colored girl." Ms. New dismissed Ms. Miller's complaints and did not follow up on them. Specifically, when Ms. Miller told Ms. New she felt discriminated against because she was "the colored girl," Ms. New would reply, "[Ms. Ballard] wouldn't do that." Dkt. 96-1 at 35, 132:7–9 (under seal). A month later, Ms. Miller again complained to Ms. New that she felt like she was being treated differently because she was the "colored girl" and again Ms. New's response was that she did not believe Ms. Miller. Ms. New testified that she never received a complaint of racial discrimination from Ms. Miller, but that Ms. Miller would complain about receiving more difficult work than other Sample Processors. Nonetheless, because the Court must consider the facts in the light most favorable to Ms. Miller, her testimony is sufficient to create a question of material fact. Ms. Miller also complained to Mr. Ziegler about being assigned hard accounts and the negativity toward her, though she did not complain her race was a factor. Still, prior to Ms.

11

Miller's termination Mr. Ziegler was aware of the allegations of racial animus as reflected in his September 19, 2009 handwritten investigation notes. Dkt. 108-1.

Ms. New, Mr. Culp and Mr. Minges were the decision makers that terminated Ms. Miller. Although Ms. Miller has not identified any direct or circumstantial evidence that any of the decision makers harbored racial animus toward her, she has identified evidence that her direct supervisor, Ms. Ballard, and co-worker, Ms. Kemp, used racially derogatory terms, harbored an racial animus and intentionally took actions to harm Ms. Miller's performance by tampering with her trays and giving her harder work than the other Sample Processors. Ms. Miller testified that these actions occurred throughout the duration of her employment and prevented her from meeting the production quota. Ms. Miller has demonstrated some causal connection between Ms. Ballard's and Ms. Kemp's bias and Ms. News's decision to terminate her employment. Specifically, Ms. Miller has presented sufficient evidence that Ms. New was influenced to act based on Ms. Ballard and Ms. Kemps racial bias and alleged acts of sabotage. Under *Schandelmeier-Bartels* and *Staub* this is sufficient circumstantial evidence to survive at the summary judgment stage. POLARIS' motion on Ms. Miller's discrimination claim is therefore **DENIED**.

Because the Court finds sufficient circumstantial evidence pointing to discrimination, it is unnecessary to go through the indirect analysis, though the Court notes much of the evidence above could go toward a pretext argument, and the Court is not convinced that Ms. Miller's performance was so deficient as to render Ms. Saperstein and Ms. Young incomparable as similarly situated employees.

**B.     Retaliation**

   **1.     Legal Principles**

"Unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003) (citations omitted). Discrimination and retaliation claims are distinct, and "a claim of retaliation does not depend on proof that any status-based discrimination actually occurred." *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 460 (2008).

As with a discrimination claim, a plaintiff asserting a claim of retaliation under Title VII or § 1981 may choose to prove his case under either direct or indirect methods of proof. *See Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). Under the direct method, the plaintiff must present evidence that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). If the plaintiff's evidence is contradicted, "the case must be tried unless the defendant presents unrebutted evidence that it would have taken the adverse employment action against the plaintiff anyway, 'in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm.'" *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003) (quoting *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)).

Under the indirect method, the plaintiff must establish a *prima facie* case by showing that (1) she engaged in protected activity; (2) she suffered a materially adverse action; (3) she was meeting the employer's legitimate expectations; and (4) she was treated less favorably than a similarly situated employee who did not engage in protected activity. *Stephens v. Erickson*, 569

F.3d 779, 786 (7th Cir. 2009). The burden then shifts to the employer to show a legitimate non-invidious reason for the adverse employment action, and the employee must then show the action is pretextual. In determining whether retaliation has occurred, the Court is not required to consider "the nature of the discrimination that led to the filing of the [underlying] charge." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).

### 2. Ms. Miller's Claim

Unlike Ms. Miller's race discrimination claim, she cannot sustain her retaliation claim under either the direct or indirect method. Although it is undisputed that Ms. Miller suffered an adverse employment action, and considering the facts most favorable to Ms. Miller, that she engaged in a statutorily protected activity, there is no evidence of a causal connection between the two. The only evidence referencing retaliation is Ms. Miller's belief that Ms. Ballard treated her poorly because Ms. Miller had complained about Ms. Ballard's failure to provide adequate training and racial bias. "A subjective belief of discrimination no matter how genuine, cannot be the sole basis for a finding of discrimination." *Kizer v. Children's Learning Ctr.*, 962 F.2d 608, 613 (7th Cir. 1992). There are no statements or suspicious conduct from Ms. Ballard, Ms. New, Mr. Culp, or Mr. Minges that suggest Ms. Miller's complaints were the true motivation for her termination.

Further, even if Ms. Miller could establish a *prima facie* case under the indirect method, she has not produced any evidence that her termination was pretext for retaliation. "Pretext means a lie, specifically a phony reason for some action." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). "Pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason." *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010). Here, the undisputed facts establish that Ms. New, Mr. Culp, and Mr. Minges were the decision

makers and they honestly believed Ms. Miller's performance was insufficient. The decision to terminate was made after providing Ms. Miller notice that her performance was lacking and needed to improve. Regardless of Ms. Ballard's alleged actions, the decision makers' reason for termination is credible and based on unassailable fact, i.e., the production reports. Therefore, Ms. Miller cannot sustain her claim for retaliation and POLARIS' motion is **GRANTED**.

## IV. <u>CONCLUSION</u>

Accordingly, POLARIS' Motion for Summary Judgment (Dkt. 94) is **GRANTED in part** and **DENIED in part**. Ms. Miller's claim of race discrimination has survived summary judgment. Ms. Miller's claim for retaliation is **DISMISSED**.

**SO ORDERED.**

Date: 02/21/2014

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Raymond J. Hafsten, Jr.
hafsten@sbcglobal.net

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Jan S. Michelsen
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
jan.michelsen@odnss.com